# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

DANNY R. HOWELL,                           :

     Plaintiff,                          :
                                 Case No. 3:13cv00005

 vs.                                     :
                             District Judge Walter Herbert Rice

CAROLYN W. COLVIN,                         :    Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                   :

     Defendant.                          :

***

## REPORT AND RECOMMENDATIONS[1]

***

## I.    <u>Introduction</u>

Plaintiff Danny R. Howell sought financial assistance from the Social Security Administration by applying for Disability Insurance Benefits ("DIB") in January 2009, alleging disability since August 3, 2005.  (*PageID##* 162-66).  He claims disability due to "[c]ontusion of back, degenerative disc disease, anxiety, [and] depression."  (*PageID#* 207).

After various administrative proceedings, Administrative Law Judge ("ALJ") Amelia G. Lombardo denied Plaintiff's DIB application based on her conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (*PageID##* 50-61).  The ALJ's nondisability determination and the

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

resulting denial of benefits later became the final decision of the Social Security

Administration.  Such final decisions are subject to judicial review, *see* 42 U.S.C. §

405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the

Commissioner's Memorandum in Opposition (Doc. #10), Plaintiff's Reply (Doc. #12),

the administrative record (Doc. # 6), and the record as a whole.

## II.  <u>Background</u>

### A.  <u>Plaintiff's Vocational Profile and Testimony</u>

Plaintiff was 44 years old on his alleged disability onset date, which defined him

as a "younger individual" for purposes of resolving his DIB claim.  *See* 20 C.F.R. §

404.1563(c); *see also PageID#* 60.  Plaintiff has a high school education.  (*Id.*). He

previously worked as a vending machine attendant.  (*PageID#* 91).

Plaintiff testified he is 5' 6" tall and weighs approximately 206 pounds.  (*PageID#*

74).  He used to weigh around 230 pounds, however, since he found out he has diabetes

he testified "I've been kind of dieting a little bit and kind of watch my weight and it's

went down some."  (*Id.*).  Plaintiff lives in a one-story house with his brother.  (*PageID#*

75).  He stated he has a driver's license, but does not drive very often.  (*Id.*).  His son

drove him to the hearing.  (*Id.*).  Plaintiff testified that he went to school until ninth grade,

got married early, had a child, and joined the Army.  (*PageID#* 76).

Plaintiff testified he was working for AVI Food Systems when he was injured on

the job.  (*PageID#* 78).  Plaintiff drove a cart and stocked soda cans in vending machines.

(*Id.*).  He explained the accident as follows:

> I fell backwards, mid back and we had some gigantic sawhorses, metal sawhorses and when I fell back, I hit my back center wise, slid down the legs of it and my bottom hit the concrete and when it did it jammed all that up in there and fractured a SI facet joint and couple bad discs, herniated disc.

(*PageID#* 79).  Plaintiff has primarily been treated with pain medication and injections.

(*PageID#* 80).  He stated he suffers from chronic pain "all the time" and that pain medications only help minimally.  (*Id.*).  Plaintiff testified he has bronchitis with emphysema, and can only walk "[a]bout a block and a half or so before [he] get[s] tired and [his] knees give out."  (*Id.*).  He stated he can stand for about 30 to 45 minutes but needs to keep changing positions or sit down.  He is unable to sleep in a bed.  He sleeps in a recliner "with tons of pillows on it to cushion it."  (*PageID#* 81).  He can only lift basic things around the house, such as a vacuum or a dish.  (*Id.*).

Plaintiff also suffers from anxiety and panic attacks.  (*Id.*).  He sees a psychiatrist approximately once every three months, who prescribes him with Xanax for his anxiety and Cymbalta for his depression.  (*PageID#* 82).  Plaintiff stated he has "my good days and bad days."  (*Id.*).  He no longer has a girlfriend.  His brother mows the lawn but Plaintiff stated "I'll do most of the housework, sweeping, stuff like that.  Fix a little dinner. . . ."  (*PageID#* 82).  He testified his brother is "slow.  He's not retarded or nothing.  He's just slow and he has a little bit of nerve damage in his legs."  (*Id.*)

Plaintiff stated he does the laundry and cares for a dog and a cat that his ex-girlfriend left when she moved out.  (*PageID#* 84).  Plaintiff stated he does not smoke,

3

but may have four drinks a month or so.  (*Id.*).  He described a typical days as follows:

> [U]sually first thing I do when I do get up is take care of the animals, let Mitch go outside.  Make sure they got food and water.  And then I might fix me a cup, a pot of coffee, watch TV and videos and it's summertime, you get out there in the yard and sit, watch the traffic go by.  What little bit of housework needs done, you know, I try to do a little bit every day so it don't pile up.

(*PageID#* 85).  Plaintiff also does the grocery shopping for himself and his brother.  He stated he did not have the mental health problems he currently has when he was previously working.  (*PageID#* 85).  He attributed this to "stress from not having no money and no way to get my other medical things I needed done, treated, and having to borrow money from people and my landlord and family.  You know, you go five years with a couple hundred here.  I still owe my landlord like $4,000 back pay." (*PageID#* 85).

Plaintiff also stated he has problems with posttraumatic stress due to thinking about the stress of his previous job.  (*PageID#* 88).  He stated he has bad dreams as a result.  (*Id.*).  Plaintiff testified he wishes he was dead "a bunch of times." (*Id.*).  He stated "[t]here's times I have wanted to kill myself but my religion, I believe if you take your life, you're going to go to hell." (*PageID#* 89).  Plaintiff has trouble with memory and concentration.  He gets confused when filling out papers.  (*Id.*).  He also has some swelling in his feet and ankles which he attributes to congestive heart failure.  (*Id.*).

### B.  **Vocational Expert Testimony**

A Vocational Expert (VE) also testified at the administrative hearing.  (*PageID##* 90-99).  ALJ Lombardo proposed a series of hypotheticals regarding Plaintiff's residual

functional capacity ("RFC") to the VE.  (*PageID##* 90-92).  The VE was asked to consider a person of Plaintiff's age, education, and work history, who can only perform work at the light exertional level; can only occasionally stoop and crouch; can change positions between sitting and standing every 30 minutes; and is limited to work that is low stress, which is no assembly line production quotas and not fast paced.  (*PageID#* 91).  Considering this hypothetical, the VE testified such an individual could perform Plaintiff's previous job as a vending machine attendant.  (*Id.*).  The VE testified that if such an individual was also limited to only minimal contact with the general public, supervisors, and co-workers, the hypothetical person would not be able to perform Plaintiff's previous job.  (*Id.*).  The VE, however, testified that such a person could nevertheless perform representative jobs at the light exertional level such as a routing clerk or laundry folder (with approximately 14,000 jobs in the regional economy), as well as 2,600 sedentary jobs in the regional economy, such as automatic grinding machine operator and clip loading machine feeder.  (*PageID#* 92).

Plaintiff's counsel asked the VE to also consider a person with the same physical limitations described previously, but who also is moderately limited in his mental ability to do the following: work consistently and without excessive breaks; maintain attention and concentration; handle frustration; deal with work demands for meeting a schedule and deadlines; deal with multi-tasking and handle pressures for speed and productivity; relate to others; handle criticism; control emotions; and deal with interpersonal problems at work.  (*PageID#* 93).  Plaintiff's counsel asked the VE to "assume that moderate is

5

defined as occasional or up to one third of the day." (*Id.*).  Considering this hypothetical, the VE testified such an individual would not be capable of gainful employment.  (*Id.*).  The VE further testified that his testimony is consistent with the *Dictionary of Occupational Titles* ("DOT").  (*PageID#* 92).

C. **Relevant Medical Opinions**

1. **Physical Impairments**

In August 2005, Plaintiff was injured at work when he fell backward and hit his back on a sawhorse.  (*PageID#* 399).  A lumbar spine MRI taken in September 2005 indicated diffuse degenerative disc space narrowing, mild disc bulging with greatest involving at the L5-S1 level, no evidence of significant encroachment of the thecal sac or evidence of spinal stenosis.  (*PageID#* 434).  Worker's compensation physician George Cochran, M.D., noted that Plaintiff has a L4-5 bulging disk "which seems to be more symptomatic than the MRI has disclosed"; his straight leg raising is positive bilaterally at 80 degrees on the right with pain across his lower back and definitely positive on the left at 70 degrees; there is a marked spasm of the paravertebral muscles and flexion; extension and twisting cause marked pain; walks with an antalgic gait; and gets on and off the table with slight difficulty.  (*PageID#* 431).

During a follow-up visit with Dr. Cochran, it was noted that Plaintiff stated "his pain level is considerably improved since he has been doing the PT.  He has approximately five or six session remaining.  A report from the physical therapist shows marked improvement."  (*PageID#* 420).

6

In April 2006, Plaintiff was examined by William Smith, M.D., in connection with his worker's compensation claim.  (*PageID#* 436-49).  Dr. Smith noted that he reviewed the MRI and "it shows a tiny midline bulging disc at L5-S1.  It also shows a defect in the lamina at L5-S1 on the left side, which appears to be a defect in a secondary osification center, but could represent a fracture.  Also the facet at L5-S1 on the left is more irregular than the one on the right."  (*PageID#* 437-38).  Dr. Smith believed that Plaintiff had not yet reached maximum medical improvement, but believes he could still perform at least sedentary work at that time (and perhaps also light work).  (*PageID#* 438).

In May 2006, Plaintiff's MRI and EMG studies indicated normal results.  (*PageID#* 514-15).  In June 2006, Plaintiff insisted that he needs four Vicodins per day, and commented that "he is taking care of mother and father and doing quite a bit of driving to doctor's offices for them."  (*PageID#* 580).  In July 2006, it was noted that Plaintiff has "a lot of pain behavior incidental to changing positions today.  He does report having moved some furniture and significantly aggravated everything over the last week.  He is tender in the lumbar left SI area.  He can sit on the exam table.  Straight leg raise test aggravates his back.  Deep tendon reflexes are 2+ in knees and ankles."  (*PageID#* 578).

In November and December 2006, Plaintiff had an epidural which provided some temporary pain relief.  (*PageID#* 474).  He rated the pain at 1 out of 10 (from the original 3 out of 10) and it was noted "he does feel that he has had a 60 to 70% improvement in his symptoms overall."  (*PageID#* 474).

7

During a follow-up visit with Dr. Goodrich in December 2006, it was reported that "[b]ased upon today's examination, it is certainly within the realm of possibility that Danny will be able to return to his regular job [on 12/18/06]." (*PageID#* 565).  In a letter dated December 15, 2006 to Dr. Goodrich, Plaintiff's physical therapist stated that he did "not see any problem with Danny returning to work at full duty as of the current plan, which would be December 18, 2006." (*PageID#* 655-56).

In February 2007, Dr. Goodrich reported that Plaintiff, during a follow-up visit, was alert, in no acute distress, had no pain behavior, no significant tenderness on palpation of the lumbar area, and he changes positions without difficulty.  (*PageID#* 558). Dr. Goodrich also reported that, prior to attending his appointment that day, Plaintiff's car was stuck in snow but that he got out of the vehicle and "actually pushed his mustang on to the point that it was able to clear the driveway.  He did that without suffering any negative consequences on his back." (*Id.*).  Dr. Goodrich opined that "I think this is a good indicator of significant improvement over the time I began seeing him and somewhat supportive of the fact that he is at this time at maximum medical improvement given that the back was not thrown into relapse by such an event." (*Id.*).

An MRI from July 2007 showed a small disc protrusion at L5-S1 abutting the left S1 nerve root with mild to moderate bilateral foraminal narrowing and a disc protrusion and annular fissure at L4-L5 resulting in contact with the left L4 nerve root.  (*PageID#* 520-21).

In October 2007, Dr. Goodrich noted that "[d]uring the last month, I have notified

8

Danny in writing that I cannot continue to be his physician of record because of the level of pain medication that is being prescribed right now." (*PageID#* 714). Dr. Goodrich also noted that "as a prescription medical pain management treating physician, I feel that the medication that we are requiring right now is over the top in terms of my expertise." (*Id.*).

In 2007, consultative examiner William Padamadan, M.D., opined that "[b]ased upon this clinical evaluation and in the absence of objective findings of any functional impairment, I do not see any indication for limitation of physical activities." (*PageID#* 688).

In November 2007, state agency reviewing physician, Elizabeth Das, M.D., opined that Plaintiff was mostly credible regarding his ability to function. (*PageID#* 812). She concluded that Plaintiff could do the following: occasionally lift 20 pounds; frequently lift 10 pounds; stand and/or walk for 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; push and/or pull without limitation; occasionally climb ramp/stairs; never climb ladders, ropes, or scaffolds; occasionally kneel, crouch, and crawl. (*PageID##* 807-15).

During 2007 and 2008, Plaintiff continued to be treated with physical therapy, a transcutaneous electrical nerve stimulation (TENS) unit, pain medication, and epidural injections. (*PageID##* 816-25, 830-32, 837, 1178, 1202).

In January 2008, a thoracic spine MRI showed degenerative changes at the mid dorsal spine with hypertrophic response and disc bulging and protrusion, however, no

9

associated foraminal stenosis or spinal canal stenosis was present.  (*PageID#* 976).  In June 2008, worker's compensation examiner Pietro Seni, M.D., concluded that Plaintiff could not return to his former position, even with restrictions, but "most likely can do sedentary work."  (*PageID#* 1054).

In May 2009, during a consultative examination, Judith Brown, M.D., noted that Plaintiff refused to perform all of the range of motion tests.  (*PageID#* 1010).  Dr. Brown stated that Plaintiff's "ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, squatting, carrying and traveling as well as pushing and pulling heavy objects appears to be at least mildly impaired by the findings noted." (*PageID#* 1014).  In May 2009, another state agency reviewing physician, Anton Freihofner, M.D., opined that Plaintiff could perform light work.  (*PageID#* 1118-1124).

In January 2010, consultative examiner Richard Ward, M.D., examined Plaintiff and opined that he could stand and walk less than one hour a day and sit up to 3 hours per day.  (*PageID#* 1302).  He limited Plaintiff to only sedentary work capabilities. (*PageID#* 1302-03).  Dr. Ward believed Plaintiff was not capable of returning to sustained gainful employment.  (*PageID#* 1301).

In May 2010, worker's compensation examiner James Lutz, M.D., examined Plaintiff and, also relying on the opinion of Dr. Ward, opined that Plaintiff is disabled. (*PageID#* 1381).  A September 2010 MRI indicated spondylolysis at L5 with slight retrolisthesis at L4-L5, as well as mild disc and facet disease at L3 through S1 with no stenosis or definite root impingement seen at any level.  (*PageID#* 1462).

10

### 2.      Psychological Impairments

Plaintiff reported symptoms of depression and anxiety in May 2007.  (*PageID#* 489).  In October 2007, consultative examiner, Lee Howard, Ph.D., diagnosed Plaintiff with mild depressive disorder.  (*PageID#* 683).  On examination, Plaintiff had a normal mood, affect and social presentation.  (*PageID#* 683).  He reported having low energy and lack of sleep; was goal directed and coherent; and his associations were normal. (*PageID#* 681).  He could perform simple tasks, relate to others without difficulty, perform in a low to moderate stress work environment, and manage his finances. (*PageID#* 684).

In February 2009, consultative examiner Giovanni Bonds, Ph.D., concluded that Plaintiff was not able to return to his former job.  (*PageID#* 389).  He found that Plaintiff was moderately limited in his ability to work consistently and without excessive breaks, maintain attention and concentration, handle frustration, deal with work-related schedules and deadlines, multi-task, and handle pressures for speed and productivity.  (*Id.*).

Throughout 2009 and 2010 Plaintiff treated with Linda Griffith, M.D., of Consolidated Care, Inc.  Dr. Griffith noted Plaintiff had abnormal mental status examination results of visible pain behavior, depressed mood, constricted and tearful affect, and feelings of helplessness, hopelessness, and worthlessness express through a constant desire to die without plan for suicide.  (*PageID##* 500, 502, 854, 856, 860, 862, 866, 872, 877, 915, 1248, 1297, 1361, 1363, 1367, 1372, 1441).  Dr. Griffith opined that due to the Plaintiff's major depressive disorder, generalized anxiety disorder, and post-

11

traumatic stress disorder combined with the synergistic depressing effects of his chronic pain, he was unable to concentrate, cope with others, or persist at an adequate level to be employed. (*PageID##* 854-55, 915-16, 1297, 1362).

In April 2009, state agency reviewing psychologist Roseann Umana, Ph.D., opined that Plaintiff was moderately limited in each functional category. (*PageID#* 992). Dr. Umana's opinion was affirmed by reviewing psychologist Frank Orosz, Ph.D. (*PageID#* 1296).

In January 2010, Lee Howard, Ph.D., conducted a comprehensive psychological examination of Plaintiff. Testing revealed that Plaintiff's capacity to work was below any employable capacity. (*PageID##* 1317-20). Dr. Howard agreed with the opinions of Dr. Griffith regarding her findings as to Plaintiff's functional limitations. (*PageID#* 1320). In November 2010, Dr. Griffith opined that Plaintiff had moderate limitations in social interaction, extreme limitations in sustained concentration, and marked to extreme limitations in adaptation as a result of his impairments. (*PageID##* 1412-14).

In March 2011, Cara Perez, M.D., a new doctor at Consolidated Care, Inc., noted that "current meds are not helping as well as [Plaintiff] would like them to. Says 'everything was fine before you came into the picture. They used to give me more of those little Morphines.'" (*PageID#* 1446).

## III.    Administrative Review

### A.    "Disability" Defined

The Social Security Administration provides DIB to individuals who are under a

"disability," among other eligibility requirements.  *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.  A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability."  *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

The term "disability" – as defined by the Social Security Act – carries a specialized meaning of limited scope.  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

### B.     Social Security Regulations

Administrative regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See PageID## 50-52; see also* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review answers five questions:

13

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can he perform his past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity (RFC), can he or she perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

### C. **ALJ Lombardo's Decision**

Plaintiff last met the insured status requirements of the Social Security Act through December 31, 2011. (*PageID# 52*).

At Step 2 of the sequential evaluation, the ALJ concluded that Plaintiff has the severe impairments of osteoarthritis and degenerative disc disease of the lumbar spine; obesity; depression; and anxiety. (*Id.*).

The ALJ concluded at Step 3 that Plaintiff does not have an impairment or combination of impairments that meet or equal one of the Listings. (*Id.*).

At Step 4, the ALJ evaluated Plaintiff's RFC and found that he could perform light work subject to the following limitations: only unskilled work; low stress work defined as no assembly line production quotas and work that is not fast paced; occasional stooping

14

and crouching; occasional stairs; no climbing of ladders, ropes, or scaffolds; minimal

contact with coworkers, supervisors, and the general public.  (*PageID#* 55).

The ALJ concluded at Step 4 that Plaintiff was unable to perform his past relevant

work.  (*PageID#* 59).

At Step 5, based on the testimony of the VE, the ALJ concluded that – considering

Plaintiff's age, education, work experience, and RFC – he is capable of performing a

significant number of jobs in the national economy.  (*PageID#* 60).

The ALJ's findings throughout her sequential evaluation led her to ultimately

conclude that Plaintiff was not under a disability, and was therefore not eligible for DIB.

(*PageID#* 61).

## IV.  <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir.

2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or

disagrees with the ALJ's factual findings or by whether the administrative record contains

evidence contrary to those factual findings.  *Rogers v. Comm'r of Soc. Sec.*, 486

F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th

Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence

standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as

15

adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    Discussion

Plaintiff argues the ALJ failed to establish the first part of the controlling weight test because she never determined whether the opinions of his treating psychiatrist, Dr. Griffith, were supported by clinical diagnostic techniques.  (Doc. #7, *PageID##* 1473-76).  Plaintiff also contends that even if it was appropriate for the ALJ not to provide Dr. Griffith's opinion controlling weight, her decision should be reversed because she failed to provide good reasons for assigning Dr. Griffith's opinions little weight.  (Doc. # 7, *PageID##* 1476-79).  Plaintiff requests the Court reverse the ALJ's decision and award

16

payment of benefits as of the alleged disability onset date.  (Doc. #7, *PageID#* 1484).

Defendant argues the ALJ properly weighed Dr. Griffith's opinion and her decision is supported by substantial evidence.  (Doc. #10, *PageID#* 1500).  Defendant also contends the ALJ properly weighed the opinions of the reviewing and examining physicians, while also considering the objective evidence, other opinion evidence, and Plaintiff's own statements.  (Doc. #10, *PageID#* 1509).  Defendant argues substantial evidence supports the ALJ's decision and should be affirmed.  (*Id.*).

Social Security Regulations recognize several different categories of medical sources: treating physicians and psychologists, nontreating yet examining physicians and psychologists, and nontreating yet record-reviewing physicians and psychologists.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source').  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Soc. Sec. Rul. No. 96-6p, 1996 WL 374180, at * 2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing 20 C.F.R. §§ 404.1502, 404.1527(c)(1)).

A treating source's opinion may be given controlling weight under the treating-physician rule only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)).  "If the

17

Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

Unlike treating physicians, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. Other facts 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion." *Id.* (citing 20 C.F.R. § 404.1527(c)(6)).

In considering Dr. Griffith's opinion, the ALJ concluded that the opinion was not entitled to controlling weight and only provided little deferential weight. (*PageID#* 59). Specifically, the ALJ stated:

> Dr. Linda Griffith, a psychiatrist, has opined that the claimant is disabled and unable to work in February 2010 (Exhibit 26F). A month later, she felt he might benefit from training for a non-physically laborious job (Exhibit 28F). She has found marked and extreme limitations in multiple areas (Exhibit 55F). However, her opinion from the discussed exhibits was based in large part on the claimant's pain complaints (Exhibit 38F), which as discussed, were very exaggerated. The claimant repeatedly was reported as embellishing his symptoms. Furthermore, Dr. Griffith is a psychiatrist and is not qualified to perform assessments on the limiting effects of his physical impairments. In addition, her opinion is inconsistent with the record as a whole. Therefore, it will be given no controlling and little deferential weight.

18

(*Id.*).  Plaintiff contends the ALJ "failed to establish the first part of the controlling weight test because she never determined whether or not Dr. Griffith's opinion was supported by clinical diagnostic techniques."  (Doc. #7, *PageID#* 1473).  Plaintiff argues the "ALJ did not once mention any of the clinical examination results of any of Mr. Howell's psychiatric examinations anywhere in the decision."  (*Id.*).  Plaintiff contends "Dr. Griffith's opinion was supported by clinical diagnostic techniques and was consistent with substantial evidence of record."  (Doc. #7, *PageID#* 1474).

A review of the record indicates Plaintiff began obtaining mental health treatment from Dr. Griffith in May 2007.  (*PageID##* 489, 854, 877).  As Plaintiff correctly notes, "[i]n every examination by Dr. Griffith Mr. Howell presented with a depressed and anxious mood and an abnormal affect, mostly constricted and tearful but also sometimes flat or irritable.  He also was always noted with feelings of worthlessness, helplessness, hopelessness and expressed a 'death wish' without a plan."  (Doc. #7, *PageID#* 1474) (citing to *PageID##* 500, 502, 854, 856, 860, 862, 866, 872, 877, 915, 1246, 1248, 1297, 1361, 1363, 1365, 1367, 1372, 1441).  When mental work abilities are at issue, such symptoms constitute supporting medical or objective evidence.  As the United States Court of Appeals for the Sixth Circuit has explained:

> In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices ... in order to obtain objective clinical manifestations of mental illness....
>
> [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of

professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir. 1987)(other citation omitted)).  The ALJ, however, did not discuss these observations and failed to properly evaluate whether Dr. Griffith's opinion was supported by clinical diagnostic techniques.

Instead, in determining Dr. Griffith's opinion to be unsupported by the evidence, it appears the ALJ relied significantly upon an "invalid" test result from the multi part Minnesota Multiphasic Personality Inventory-2 (MMPI-2) test conducted by consultative examiner, Dr. Bonds.  Yet even this conclusion is not supported by substantial evidence. For example, the ALJ stated these test scores were "determined to be invalid" by Dr. Bonds based on Plaintiff "exaggerating his symptoms and problems."  (*PageID#* 56).  A review of the record, however, indicates such a finding is simply not correct.  Dr. Bonds did not invalidate the test scores, as the ALJ stated and relied upon.  Dr. Bonds did note that Plaintiff "responded to the test by exaggerating his problems and symptoms possibly as a plea for help," however, he did not deem the scores to be invalid.  Rather, Dr. Bonds specifically took Plaintiff's exaggerations on the test – his "response bias" – into account and noted that it was reflected in the validity scales.  (*Id.*).  He specifically stated the "test results are interpreted with this response bias in mind."  (*PageID#* 388).  The ALJ's finding that such scores were somehow "invalidated" is not supported by the record, and

reliance upon such an incorrect conclusion was improper.  Moreover, the fact Plaintiff may have exaggerated symptoms on the MMPI-2 does not – despite the ALJ's apparent belief otherwise – conclusively establish that he also exaggerated all or some of the symptoms he reported to his treating psychiatrist, Dr. Griffith.  For example, it was reported that Plaintiff's "MMPI-2 [results] indicate[] exaggerated reporting of psychological problems *possibly in an attempt to plea for more help from [the Bureau of Workers' Compensation]*."  (*PageID#* 389)(emphasis added).  Thus, even if Plaintiff exaggerated his symptoms during the MMPI-2 test as a plea for more help from the BWC, it is not clear – absent further discussion from the ALJ – how the ALJ could properly infer that all symptoms reported by Plaintiff to Dr. Griffith, spanning the many years of treatment with her, were also likewise exaggerated.

The Court also notes that, in addition to failing to properly evaluate Dr. Griffith's opinions for controlling weight, the reasons provided by the ALJ for assigning this psychiatrist's opinion little weight are not supported by substantial evidence.  Little weight was given to Dr. Griffith's opinion because the ALJ concluded it was simply based on Plaintiff's complaints of physical impairments, Dr. Griffith was not qualified to assess such physical complaints, and Dr. Griffith's opinion was inconsistent with the record as a whole.  (*PageID#* 59).  As the Court previously noted, however, Dr. Griffith did not merely rely upon Plaintiff's subjective complaints regarding physical impairments, but considered Plaintiff's psychological symptoms, signs, and test results in concluding he is disabled.  A careful reading of her opinion clearly indicates such a point.

21

(*PageID#* 854)("I can only address his psychiatric symptoms . . . . [I]t is my professional opinion that Mr. Howell's current Major Depressive Disorder, chronic, severe, without psychotic features; Posttraumatic Stress Disorder and Generalized Anxiety Disorder continue to render him completely unable to work at any level.").  The ALJ's finding to the contrary is incorrect.  And while the ALJ concluded that Dr. Griffith's opinion "is inconsistent with the record as a whole," she failed to provide further discussion or examples of such inconsistencies.  (*PageID#* 59).  Such a summary dismissal of Dr. Griffith's opinion fails to meet the requirement that the ALJ "give good reasons" for not giving weight to a treating physician.  *See Wilson*, 373 F.3d at 544-45.

Accordingly, for all the above reasons, Plaintiff's Statement of Errors is well taken.

## VI.  <u>Remand is Warranted</u>

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming, and because the evidence of a disability is not strong while contrary evidence is weak.  *See id.* However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of § 405(g) due to problems discussed *supra*.

On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulation and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for DIB should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1.    The ALJ's non-disability finding be vacated;

2.    No finding be made as to whether Plaintiff was under a "disability" within the meaning of the Social Security Act;

3.    This matter be **REMANDED** to the Social Security Administration pursuant to Sentence Four of 42  U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4.    The case be **TERMINATED** on the docket of this Court.


December 10, 2013                                    _____s/ Sharon L. Ovington_____
                                                                   Sharon L. Ovington
                                                                   Chief United States Magistrate Judge

23

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).